RECEIVED
USDC, WESTERN DISTRICT OF LA
ROBERT H. SHEMWELL, CLERK
DATE 10/11/05

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAKE CHARLES DIVISION

| | | |
|---|---|---|
| JOHN E. SMITH | : | **DOCKET NO. 2:04 CV 1316** |
| VS. | : | **JUDGE MINALDI** |
| PREMIER FORD LINCOLN MERCURY, L.L.C., ET AL. | : | **MAGISTRATE JUDGE WILSON** |

### <u>MEMORANDUM RULING</u>

Presently before the court is a Motion to Dismiss pursuant to Rule 12(b)(6) [doc. 14], which the court notified the parties that it would consider as a Motion for Summary Judgment [doc. 58]. The parties were allowed time to file briefs and to submit competent summary judgment evidence.

Procedural History

On April 20, 2004, the plaintiffs, John E. Smith, James A. Smith, and Deborah Smith, filed suit in state court, the 30th JDC, Parish of Vernon. The plaintiffs are asserting claims for damages arising from an automobile accident on May 15, 2003, in Vernon Parish. The plaintiffs allege that Ford Motor Company manufactured and Premier Ford Lincoln Mercury, L.L.C., sold a 2003 Ford F-150 with a defective rear axle and that said defect caused the accident in question.

Ford removed this action based upon diversity. The defendants contended that Premier was fraudulently joined and should be dismissed. The defendants argued that Premier did nothing more than sell the allegedly defective vehicle and therefore could not be liable under Louisiana law. Premier filed the 12(b)(6) motion alleging that the claims against it should be dismissed; asserting that the arguments on the Motion to Remand and the 12(b)(6) motion were interconnected.

On January 25, 2005, Magistrate Judge Wilson issued an R&R recommending that the case be remanded to state court. The defendants objected to the R&R and also urged their objections in support of Premier's Motion to Dismiss. This court heard oral arguments and determined that the remand should be denied.

## Summary Judgment Standard

Summary judgment is appropriate when the movant is able to demonstrate that the pleadings, affidavits, and other evidence available to the Court establish that there are no genuine issues of material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c); See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. 2548, 2552-54, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); and *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-88, 106 S.Ct. 1348, 1355-57, 89 L.Ed.2d 538 (1986). When the nonmoving party has the burden of proof on an issue, the movant must state the basis for the motion and identify those portions of the pleadings, depositions, admissions, answers to interrogatories, together with affidavits, that demonstrate the absence of a genuine issue of material fact. [1] *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *Topalian v. Ehrman*, 954 F.2d 1125, 1131-32 (5th Cir.1992), cert. denied, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). A mere conclusory statement that the other side has no evidence is not enough to satisfy a movant's burden. See *Celotex*, 477 U.S. at 328, 106 S.Ct. at 2555.

---

[1] FN1. A "material" fact is one that might affect the outcome of the suit under the applicable substantive law. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. In order for a dispute to be "genuine," the evidence before the Court must be such that a reasonable jury could return a verdict for the nonmoving party. *Id.*, see also, *Judwin Properties, Inc. v. United States Fire Ins. Co.*, 973 F.2d 432, 435 (5th Cir.1992).

Once the movant has shown the absence of material factual issues, the opposing party has a duty to respond, via affidavits or other means, asserting specific facts demonstrating that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514; *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. The Court must view the evidence introduced and all factual inferences from the evidence in the light most favorable to the party opposing summary judgment. *Eastman Kodak v. Image Technical Services*, 504 U.S. 451, 456-58, 112 S.Ct. 2072, 2077, 119 L.Ed.2d 265 (1992); *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. However, a party opposing summary judgment may not rest on mere conclusory allegations or denials in his pleadings. Fed.R.Civ.P. 56(e); see also *Topalian*, 954 F.2d at 1131.

Facts

On September 2, 2004, the plaintiffs amended their complaint to state that Premier was notified of the problem with the truck, and that Premier negligently inspected and/or repaired the truck. The plaintiffs are alleging that the axle defect was present at the time they bought the vehicle. Under these circumstances, Premier can only be responsible for damages in tort if it "knew or should have known that the product sold was defective, and failed to declare it." *Wilson v. State Farm Fire & Cas. Ins.Co.*, 94-1342 (La.App. 3d Cir. 4/5/95), 654 So.2d 385, 387. Premier had no legal duty to inspect the vehicle for inherent vices or defects prior to sale. Once it undertook this task upon the Smith's alleged complaints about noises and vibrations, it assumed a duty to perform the inspection in a non-negligent manner. At issue in this regard is whether a normal, reasonable person in Premier's shoes, with the experience and knowledge of trucks would or should have taken particular notice of the axle given the subjective complaints that were being made by the Smiths and if so, would they have realized it was a safety hazard. If a prudent inspection would have uncovered

3

the axle's unreasonably dangerous condition, Premier would have had an affirmative duty to repair the axle. Premier submitted expert testimony that the complaints made by the Smith's were not indicative of axle fatigue, that the Smith's never complained of axle problems, and that the Smith's own expert said that the axle gave way "suddenly and without warning." The plaintiff's expert, G.D. Whitehouse, opined that the rear axle broke due to "fatigue failure" which was a design defect. He testified that the axle broke "suddenly and without warning" and that the driver, John Smith "would not have had any indication that the axle would break as the actual breakage would be sudden." Thus, the plaintiff's own evidence refutes their position. Premier acknowledges making some repairs to the truck, but nothing associated with the rear axle.

The subject vehicle was allegedly new when sold to the Smiths. The defendants introduced evidence that there had been no recalls or Technical Service Bulletins issued by Ford Motor Company regarding the rear axle system. No warranty work was performed on the subject vehicle. The vehicle was serviced by Premier two times: February 18, 2003 for an inspection sticker and on March 2, 2003 for the installation of a remote start system and bed extender. Premier asserts that none of the work performed by Premier pertained to the rear axle system. Premier states that the plaintiffs did not voice any complaints about the rear axle system prior to the accident.

Ford Design Analyst Engineer ("DAE") Ken Waller inspected the vehicle. Waller states that the alleged noises and vibrations described by the Smiths are not consistent with rear axle failure.

The plaintiffs assert that John Smith heard a loud grinding noise coming from the vehicle. He allegedly reported this noise to his parents, James and Deborah Smith. See depo. John Smith, p. 28. Deborah Smith testified that she telephoned Kevin Walker, the sales consultant at Premier

Ford who sold them the vehicle, and complained about the grinding noise. In their affidavits, the plaintiffs allege that Kevin Walker picked up the vehicle at their residence to take it to the dealership for an inspection and he later brought it to their home. However, in their depositions the plaintiffs testified that they did not know if it was Walker himself who picked up the vehicle or someone else. See depo. Deborah Smith, pp. 11-12; Depo. James Smith, pp. 35-36; Depo. John Smith, pp. 17-18. The plaintiffs allege Deborah Smith conversed with the dealership concerning the grinding noise prior to the accident.

Kevin Walker testified that he does not recall having any conversations with Deborah Smith in which she complained of the loud grinding noise. He testified that he did not go to the residence to pick up the vehicle, but he sent Cliff McGee. McGee was to drive the vehicle to the dealership to have a remote starter system installed. Walker testified that McGee did not report any loud grinding noise to him.

Law

The plaintiffs argue that Premier had actual or constructive knowledge of the defective rear axle of the F-150, but failed to inform the purchasers, the Smiths, of the defects. A seller of a defective product may be liable in tort if he knew or should have known that the product was defective. *Kelley v. Price- Maceman,* 992 F.2d 1408, 1414-1415 (5th Cir 1993).

The Louisiana Products Liability Act establishes the exclusive theories of liability for manufacturers for damages caused by their products. A manufacturer of a product is liable for damages proximately caused by a "characteristic of the product that renders the product unreasonably

dangerous when such damage arose from a reasonably anticipated use of the product by the claimant

or another person or entity." La. R.S. 9:2800.54. "Manufacturer" is defined in the Act, in pertinent

part:

(1) "Manufacturer" means a person or entity who is in the business of manufacturing a product for placement into trade or commerce. "Manufacturing a product" means producing, making, fabricating, constructing, designing, remanufacturing, reconditioning or refurbishing a product. "Manufacturer" also means:

(a) A person or entity who labels a product as his own or who otherwise holds himself out to be the manufacturer of the product.

(b) A seller of a product who exercises control over or influences a characteristic of the design, construction or quality of the product that causes damage.

(c) A manufacturer of a product who incorporates into the product a component or part manufactured by another manufacturer.
La.R.S. 9:2800.53(1).

In contrast, the Act defines a "seller" as "a person or entity who is not a manufacturer and

who is in the business of conveying title to or possession of a product to another person or entity in

exchange for anything of value." La.R.S. 9:2800.53(2). Premier fits this definition. A non-

manufacturing seller who does not vouch for the product by holding it out as his own does not incur

strict manufacturer's liability under the LPLA, but is responsible for damages in tort "only if he knew

or should have known that the product sold was defective, and failed to declare it." *Wilson v. State*

*Farm Fire & Cas. Ins.Co.,* 94-1342 (La.App. 3d Cir. 4/5/95), 654 So.2d 385, 387; *Davis v.*

*Burlingame,* 607 So.2d 853 (La.App. 2d Cir.1992), *writ denied* (1993); *Hopper v. Crown,* 560 So.2d

890, 893 (La.App. 1st Cir.1990); *Picolo v. Flex-A-Bed, Inc.,* 466 So.2d 652 (La.App. 5th Cir.), *writ*

*denied,* 467 So.2d 1134 (1985); *Jones v. Employers Mut. Liability Ins. Co.,* 430 So.2d 357, 359

(La.App. 3d Cir.1983); *Nelton v. Astro-Lounger Mfg. Co. Inc.,* 542 So.2d 128, 131 (La.App. 1st Cir.1989); *Harris v. Atlanta Stove Works, Inc.,* 428 So.2d 1040, 1043 (La.App. 1st Cir.), *writ denied,* 434 So.2d 1106 (1983).

The plaintiffs argue negligent repair. However, in order to justify the imposition of a manufacturer's strict liability, an act of repair must rise to the level of control over the manufacturing process or product quality contemplated by the LPLA. An act of repair not intended to alter the basic design, does not rise to this level. The plaintiff must demonstrate that these authorized repairs were of such a substantial nature as to be considered "remanufacturing, reconditioning, or refurbishing a product" as opposed to merely cosmetic repairs. *See also* John N. Kennedy, *A Primer on the Louisiana Products Liability Act,* 49 LA.L.REV. 565, 572 (1989)(in order for Premier to be considered a manufacturer under the LPLA it must do something to the product that influences it in a meaningful and creative way.)

Regardless of the discrepancies in the testimony, there is no evidence that Premier knew or should have known of the alleged defect or that any repair they might have made rises to a level which would incur liability under the LPLA.

Lake Charles, Louisiana, this ___/\___ day of October, 2005.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE

COPY SENT
DATE 10/12/05
BY
TO

7